# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. _____ |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) |

## COMPLAINT

Plaintiff, the United States of America ("United States"), alleges:

1. This action is brought on behalf of the United States to enforce the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

2. All conditions precedent to the filing of suit have been satisfied.

## JURISDICTION AND VENUE

3. This Court has jurisdiction of the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1331 and § 1345. Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) because this is the district where the unlawful employment practice is alleged to have been committed.

## PARTIES

4. Plaintiff is the United States of America.

5. Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") is one of the largest transportation systems in the United States and employs over 9,000 individuals. SEPTA has a transit police department which is responsible for policing the entire regional

SEPTA system covering five Pennsylvania counties and three states (Pennsylvania, Delaware, and New Jersey).

6. SEPTA is a corporate, governmental body, and a political subdivision of the Commonwealth of Pennsylvania.

7. SEPTA is a "person" within the meaning of 42 U.S.C. § 2000e(a), and an "employer" within the meaning of 42 U.S.C. § 2000e(b).

## STATEMENT OF EEOC CHARGES

8. On or about October 21, 2019, the Equal Employment Opportunity Commission ("EEOC") received timely charges of discrimination filed by Jon Randolph ("Randolph") (EEOC Charge No. 530-2020-00485), Nathan D'Ettorre ("D'Ettorre") (EEOC Charge No. 530-2020-00484), and Anthony Lederer ("Lederer") (EEOC Charge No. 530-2020-00487), against the Southeastern Pennsylvania Transportation Authority ("SEPTA"). On or about January 24, 2020, the EEOC received a timely second charge of discrimination filed by Randolph (EEOC Charge No. 530-2020-01951). In their charges, Randolph, D'Ettorre, and Lederer (collectively, "Charging Parties") alleged, *inter alia*, that Bryan McCauley ("McCauley"), their supervisor, subjected them to a hostile work environment which included harassment based on race and religion and included physical threats and assaults. Further, they alleged that, after reporting the harassment, they suffered retaliation by being threatened with discipline and polygraphs, were admonished by the Chief of Police for putting SEPTA's reputation at risk, and endured greater scrutiny with threatened investigations against them.

9. Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated all the charges and found reasonable cause to believe that the Charging Parties were subjected to

unlawful harassment by SEPTA based on race and religion, creating a hostile work environment for the Charging Parties, and that SEPTA retaliated against them for filing complaints of harassment and discrimination in violation of Title VII.

10. After unsuccessfully attempting to achieve a voluntary resolution of each of the charges through conciliation with SEPTA, the EEOC referred the charges to the Department of Justice.

## FACTUAL ALLEGATIONS

11. At all times relevant to this action, Randolph, Lederer, and D'Ettorre were "employees" of SEPTA within the meaning of 42 U.S.C. § 2000e(f).

12. Randolph is African-American and Muslim.

13. Lederer and D'Ettorre are Caucasian. Lederer and D'Ettorre are not Muslim.

14. SEPTA hired Randolph in approximately September 2016 as a Transit Police officer. He served as a patrol officer until approximately December 2018, when he was selected to join a Special Investigation Unit ("SIU2") as a detective. He served in that unit from approximately December 2018 through October 2019. In late October 2019, Randolph was transferred out of the SIU2 unit and has served as a patrol officer for SEPTA since that time.

15. SEPTA hired D'Ettorre in approximately September 2016 as a Transit Police Officer and he served as a patrol officer until approximately December 2018. In approximately December 2018, he was selected to join the SIU2 as a detective. He served as a detective in the SIU2 until approximately October 2019, when he was transferred out of the unit and assigned back to patrol and later was assigned to a Special Operations Response Team. D'Ettorre left SEPTA's employment in or around March 2022.

16. SEPTA hired Lederer in approximately September 2016 as a Transit Police Officer and he served as a patrol officer until approximately July 2019. In July 2019, he was selected to join the SIU2 as a detective. He served as a detective in the SIU2 until approximately October 2019 when he was transferred out of the unit and assigned back to patrol. He was later assigned to the Criminal Investigations Unit as a detective. Lederer left SEPTA's employment in or around May 2022.

17. Bryan McCauley was hired by former Police Chief Thomas Nestel as a Transit Police Officer for SEPTA on approximately September 14, 2015. McCauley served in the Special Investigation Unit at SEPTA beginning in January 2017.

18. Chief Nestel previously worked with McCauley when Nestel was police chief of another district and hired McCauley at SEPTA, even though he was aware that McCauley resigned from that police district a few years earlier for a terminable offense.

19. McCauley supervised Randolph, Lederer, and D'Ettorre while they served as detectives in the SIU2. As their supervisor, he controlled their schedules, approved or denied overtime and their leave, controlled their lunch breaks, and approved and denied training. He directed their daily assignments and dictated their presence in and/or outside of the office, requiring them to remain together and rarely allowing any of them to leave the group. He was given the authority to recommend an officer's assignment to and transfer out of the SIU2 unit.

20. Chief Nestel became the Chief of Police of SEPTA on approximately August 20, 2012. He was the direct supervisor of Bryan McCauley when McCauley served as a supervisor in the SIU2 unit over Randolph, Lederer, and D'Ettorre. Chief Nestel granted McCauley his supervisory duties over Randolph, Lederer, and D'Ettorre. Chief Nestel instructed Randolph,

Lederer, and D'Ettorre that they were to report directly to McCauley and follow his orders. Chief Nestel left SEPTA's employment in or around July 5, 2022.

### A. McCauley Subjected Randolph, Lederer, and D'Ettorre to a Hostile Work Environment based on Race and Religion, Which Included Physical Threats and Assault

21. McCauley harassed Randolph during Randolph's entire employment within the SIU2 under McCauley's supervision. The harassment was based on Randolph's race and religion and included both verbal harassment and physical threats and assault.

22. McCauley harassed Lederer and D'Ettorre during their entire employment within the SIU2 under McCauley's supervision. The harassment was based on Randolph's race and religion and included physical threats and assault directed at each of them.

23. In April 2019, McCauley printed an Instagram story in which the "N" word was used several times. He read the post multiple times to Randolph and D'Ettorre, hung it above his desk, and declared that it was the "squad's mission statement." He later told Lederer about this and defended his actions.

24. In July 2019, and in the months following, McCauley several times made racist jokes in front of all three officers about black employees, including Randolph, liking fried chicken. Lederer and D'Ettorre were present and witnessed McCauley making these comments to, and in front of, Randolph.

25. McCauley made several racially derogatory statements to Randolph, including racially charged comments about black women, and on another occasion, McCauley referred to an African-American Marine officer whose last name was Green, as Dark Green Marine.

26. McCauley also made racially derogatory comments in front of Randolph, Lederer, and D'Ettorre, including comments that a SEPTA officer couldn't be taken seriously because he wore dreadlocks. McCauley also used the N-word when referencing an individual, and made other racially derogatory comments in the workplace, including several times referring to the Black Lives Matter movement as a terrorist group.

27. McCauley, knowing Randolph is Muslim, targeted his religion, making frequent discriminatory statements about Muslims.

28. Several times, McCauley played ISIS beheading videos, showing them to Randolph and suggesting that Muslims are terrorists. On another occasion, while driving by a Ramadan celebration in a park, McCauley made negative comments to Randolph about the gathering.

29. McCauley commented, with Randolph, Lederer, and D'Ettorre all present, that Muslim women should not be allowed to wear a hijab and made similar comments with all three present every time he saw a Muslim person dressed in traditional clothing.

30. McCauley regularly physically threatened Randolph, Lederer, and D'Ettorre and physically assaulted all three.

31. On several occasions, McCauley pointed his loaded firearm at Randolph, Lederer, and D'Ettorre. On one occasion, he pointed the firearm at D'Ettorre and said, "Nathan, today might be the day." McCauley also aimed a live taser at D'Ettorre, pointed the red laser dots on his chest and chased him with it multiple times, ignoring D'Ettorre's protests to stop. Several times a week, McCauley stabbed D'Ettorre with a plant, at times drawing blood. He threw objects at D'Ettorre, including scissors, a radio, handcuffs, wire cutters, a wrench, metal shears,

and a chair, and would explain he was aiming for D'Ettorre's head. At random times, McCauley would kick D'Ettorre. Most of these incidents occurred while Randolph, Lederer, and D'Ettorre were all present together.

32. On one occasion, while holding a hunting knife, McCauley aggressively walked towards Lederer, holding the knife inches from his stomach, and said, "What if I just stabbed you with this right now?" He also threatened D'Ettorre with the knife, simulating stabbing him, and said, "Wouldn't it be something if I stabbed you." Randolph, Lederer, and D'Ettorre were all present during these incidents. With Randolph and Lederer present, he told D'Ettorre, "If there was ever an active shooter situation I would shoot you in the head and make it appear as if the shooter did it." In a text that was sent to both Randolph and D'Ettorre, McCauley stated, "When my psych issues kick in u gotta be prepared. I'm one of those guys that's gonna kill your whole family, burn down your neighbors [sic] house and let you live."

33. SEPTA's Police Board of Inquiry ("PBI"), which is responsible for determining policy violations, including complaints of race and religious harassment like those made by Randolph, Lederer, and D'Ettorre against McCauley, found that McCauley used his position in scheduling assignments, overtime, granting time off and other tasks, "as weapons" to create a hostile work environment. It found that McCauley subjected Randolph, Lederer, and D'Ettorre to a hostile work environment, which included harassment based on race, religion, and physical and mental abuse and intimidation. It further held that "there was evidence to support a pattern of behavior of making racially disparaging comments especially against African Americans." It referred to McCauley's actions as "appalling."

**B.     Randolph, Lederer, and D'Ettorre Feared Reporting McCauley While They Were Under His Supervision**

34.     McCauley threatened Randolph, Lederer, and D'Ettorre on an almost daily basis to ensure they did not report him. McCauley made clear to Randolph, Lederer, and D'Ettorre that he was close to the Chief and threatened their careers. For example, McCauley threatened, "I'll make sure you're dead to the Chief." He also said, "Even if you try to make complaints, I'll make sure your career is over." Referring to his direct line to the Chief, McCauley said, "One call, one button, one touch [and you're done]."

35.     McCauley followed through on his threat and recommended that Lederer and D'Ettorre be transferred out of the SIU2 as detectives and return back to patrol. Both Lederer and D'Ettorre were then transferred to patrol.

36.     After Randolph, Lederer, and D'Ettorre were no longer under McCauley's supervision, they immediately reported the harassment to SEPTA's Internal Affairs.

37.     SEPTA's PBI found that it was reasonable that Randolph, Lederer, and D'Ettorre waited until they were no longer under McCauley's supervision to report the harassment to SEPTA's Internal Affairs. Specifically, it concluded, "This Board recognizes that there was a reasonable perception of fear of retaliation by their immediate supervisor."

38.     Upon finding that McCauley subjected Randolph, Lederer, and D'Ettorre to a hostile work environment, the PBI recommended McCauley's termination.

39.     Chief Nestel instead allowed McCauley to resign, and no discipline was administered against McCauley.

    **C.**    **Randolph, Lederer, and D'Ettorre Were Retaliated Against for Making Complaints of Race and Religious Harassment Against McCauley**

    40.    On approximately October 25, 2019, Randolph, Lederer, and D'Ettorre filed complaints of harassment against McCauley.

    41.    SEPTA retaliated against Randolph, Lederer and D'Ettorre because they filed harassment complaints. During the investigation of their harassment complaints, they were threatened with polygraph exams, they were threatened with discipline in relation to their reports of harassment, they were admonished in writing by the Chief for putting the reputation of SEPTA at risk, and he ordered discipline be administered against them, overruling the determination by the PBI that no such discipline should issue. Randolph, Lederer, and D'Ettorre were also subjected to retaliation and intimidation when their work was unduly scrutinized. Lederer was further retaliated against by SEPTA when it threatened him with termination for an offense not subject to such severe discipline, and included such allegations on his official records which were not supported by the facts.

    42.    Randolph, Lederer, and D'Ettorre suffered emotional distress from the hostile work environment and retaliation.

**TITLE VII VIOLATIONS**

COUNT I
Title VII, 42 U.S.C. § 2000e-2(a)
(Hostile Work Environment)

    43.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 11-42 above.

44. Randolph was subjected to a hostile work environment including harassment based on race (African-American) and religion (Muslim) by his supervisor, McCauley, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

45. Lederer and D'Ettorre were subjected to a hostile work environment in violation of 42 U.S.C. § 2000e-2(a). They are persons aggrieved under Title VII and were within the "zone of interest" of the hostile work environment. They were targeted by McCauley and were not accidental victims or mere bystanders; they suffered injury.

46. The harassment and hostile work environment included both verbal and physical harassment and assault directed at Randolph, Lederer, and D'Ettorre.

47. The harassment was severe and pervasive; detrimentally affected Randolph, Lederer, and D'Ettorre; and created an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive, and which Randolph, Lederer, and D'Ettorre perceived to be abusive.

48. SEPTA is vicariously liable because McCauley acted as Randolph, Lederer, and D'Ettorre's supervisor and had the authority to assign work, set hours, was empowered by SEPTA to take tangible employment actions, and among other things, controlled the daily work assignments of Randolph, Lederer, and D'Ettorre.

49. Randolph, Lederer, and D'Ettorre did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

<u>COUNT II</u>
<u>Title VII, 42 U.S.C. § 2000e-3(a)</u>
<u>(Retaliation)</u>

50. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 11-42 above.

51. Randolph, Lederer, and D'Ettorre engaged in protected activity when they complained about harassment based on race and religion.

52. In retaliation for their complaints, SEPTA threatened all three with polygraph exams and discipline.  Further, they were admonished by the Chief, and the Chief ordered discipline against all three, overruling the determination by the PBI that no such discipline should issue.  They were also subjected to intimidation and scrutiny with regard to their work.  Lederer was additionally threatened with termination for a non-terminable offense.

53. There was a causal connection between Randolph, Lederer, and D'Ettorre's complaints and the materially adverse actions taken against them.

54. The retaliation endured by Randolph, Lederer, and D'Ettorre would dissuade a reasonable employee from making complaints of harassment.

55. SEPTA retaliated against Randolph, Lederer, and D'Ettorre for engaging in protected activity in violation of Title VII, 42 U.S.C. § 2000e-3(a).

**PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court grant the following relief:

(a) Enjoin Defendant from causing, creating, or condoning a hostile work environment;

(b)     Order Defendant to develop and implement appropriate and effective measures designed to prevent and correct harassment, including, but not limited to, policies and training for employees and managers;

(c)     Order Defendant to develop appropriate and effective measures to receive complaints of discrimination and harassment, as well as a process for investigating such complaints;

(d)     Order Defendant to develop appropriate and effective corrective measures for addressing complaints of harassment and discrimination that have been substantiated;

(e)     Order Defendant to develop appropriate and effective measures to ensure that employees who file complaints of harassment and discrimination are not retaliated against;

(d)     Award compensatory damages to Randolph, Lederer, and D'Ettorre to fully compensate them for their injuries, pain and suffering caused by Defendant's discriminatory conduct, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a;

(e)     Award any additional equitable relief necessary to make the victims whole; and

(f)     Award such additional relief as justice may require, together with the United States' costs and disbursements in this action.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

Dated: August 1, 2022

                        Respectfully submitted,

                        KRISTEN CLARKE  
                        Assistant Attorney General  
                        Civil Rights Division

BY:

                        KAREN D. WOODARD  
                        Chief, Employment Litigation Section  
                        Civil Rights Division  
                        United States Department of Justice

                        */s/ Lori Kisch*  
                        LORI B. KISCH (DC Bar No. 491282)  
                        Special Litigation Counsel  
                        Employment Litigation Section  
                        Civil Rights Division  
                        United States Department of Justice  
                        150 M Street, N.E.  
                        Washington, D.C. 20530  
                        (202) 305-4422  
                        (202) 514-1105 (fax)  
                        Lori.Kisch@usdoj.gov

                        */s/ Young Choi*  
                        YOUNG CHOI (CA Bar No. 327027)  
                        Trial Attorney  
                        Employment Litigation Section  
                        Civil Rights Division  
                        United States Department of Justice  
                        150 M Street, N.E.  
                        Washington, D.C. 20530  
                        Young.Choi@usdoj.gov

                        Attorneys for The United States of America